PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1862
_____

SIH PARTNERS LLLP, EXPLORER PARTNER
CORPORATION,
Tax Matters Partner,

<u>Appellant</u>

v.

COMMISSIONER OF INTERNAL REVENUE
_____

On Appeal from the United States Tax Court,
Internal Revenue Service
(Tax Court No. IRS-1:  15-03427)
Tax Court Judge:  Mary Ann Cohen
_____

Argued March 8, 2019

BEFORE:  AMBRO, RESTREPO, and GREENBERG,
<u>Circuit</u> <u>Judges</u>

(Filed: May 7, 2019)

_____

Sean M. Akins
Robert A. Long, Jr.
Ivano M. Ventresca
Covington & Burling
850 10th Street, N.W.
One City Center
Washington, DC 2001

Thomas H. Dupree (argued)
Jacob Spencer
Gibson Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Washington, DC 20036

Kristen M. Garry
Mark D. Lanpher
Robert A. Rudnick
Shearman & Sterling
401 9th Street, N.W.
Suite 800
Washington, DC 20004

    Attorneys for Appellant

Gary R. Allen
Judith A. Hagley (argued)
Gilbert S. Rothenberg
Francesca Ugolini
United States Department of Justice
Tax Division

950 Pennsylvania Avenue, N.W.
P.O. Box 502
Washington, DC 20044

Julie A. Porter Gasper
Richard A. Rappazzo
Internal Revenue Service
4050 Alpha Road
14th Floor MS 2300 NDAL
Dallas, TX 75244

Jeffrey H. Fenberg
Suite 300
1000 South Pine Island Road
Royal Palm One
Plantation, FL 33324

    Attorneys for Appellee

_____

OPINION

_____

GREENBERG, Circuit Judge.

## I.   INTRODUCTION

This matter comes on before this Court on the appeal of SIH Partners LLLP Explorer Partner Corp., Tax Matters Partner, challenging a United States Tax Court decision on summary judgment holding it liable for back income taxes. For the reasons stated below, exercising plenary review, see Duquesne Light Holdings, Inc. & Subsidiaries v. Comm'r of Internal

Revenue, 861 F.3d 396, 403 (3d Cir. 2017), we will affirm the decision and order of the Tax Court.

## I.   BACKGROUND

In its comprehensive opinion, the Tax Court made detailed factual findings which we accept.  See SIH Partners LLLP v. Comm'r of Internal Revenue, No. 3427-15, 2018 WL 487089, at *1-4 (T.C. Jan. 18, 2018).  We point out, however, that the Court found many facts that are immaterial to our analysis.[1]  Though the financial history of this case is very complex the issues before us boil down to whether a United States entity incurs taxes on income made by its Controlled Foreign Corporations ("CFC")[2] in circumstances defined by applicable statutes and their implementing regulations, and, if so, the tax rate on the income.

Normally, a CFC's income is not taxable to its domestic shareholder or shareholders unless and until the income is

---

[1] This is not surprising because the Tax Court recited that "[w]e state the stipulated facts in greater detail than may be necessary so that the record is complete."  SIH Partners v. Comm'r, 2018 WL 487089, at *1.

[2] CFC is defined as "any foreign corporation if more than 50 percent of—(1) the total combined voting power of all classes of stock of such corporation entitled to vote, or (2) the total value of the stock of such corporation[—]is owned . . . or is considered as owned . . . by United States shareholders on any day during the taxable year of such foreign corporation."  26 U.S.C. § 957(a).

4

distributed to them, a process commonly known as repatriation. Thus, a domestic shareholder in a CFC does not incur a taxable event by reason of its CFC earning income until the shareholder actually receives a monetary return from its foreign investment and holdings. In the face of this straight-forward principle, easily stated though not always easily applied, taxpayers attempting to avoid domestic taxes though nevertheless seeking to benefit from foreign earnings of their CFC hit upon the idea of taking loans either from the CFC or from third-party financial institutions using the CFC's assets as collateral or having the CFC guarantee the loans. Even though those maneuvers allowed domestic shareholders to benefit from a CFC's earnings, it appears that prior to 1962 the IRS did not consider the taking of a collateralized or guaranteed loan from or with the participation of a CFC as a taxable event, even though the process allowed domestic shareholders effectively to obtain a monetary return on their foreign investment.

The foregoing tax avoidness method permitted a domestic shareholder to delay indefinitely any taxes on foreign income, while making use of the foreign income by continuously taking out loans using its CFC's assets as collateral or by having the CFC guarantee the loans. Domestic corporations exploited this loophole by forming CFCs in foreign tax havens to which they transferred portable income, thereby avoiding or at least delaying taxes on the income at United States domestic tax rates, even though the taxpayers had the benefit of having received the income.

Not surprisingly Congress took steps to close the CFC loophole by enacting the Revenue Act of 1962 ("Act") "to prevent the repatriation of income to the United States in a manner which does not subject it to U.S. taxation." Dougherty

5

v. Comm'r of Internal Revenue, 60 T.C. 917, 929 (1973) (citation omitted). The Act essentially requires the inclusion in the domestic shareholder's annual income of any increase in investment in United States properties made by a CFC it controls. The rationale for the Act is clear—any investment by a CFC in United States properties is tantamount to its repatriation. Id. United States property is defined as including, among other things, "an obligation of a United States person[.]" 26 U.S.C. § 956(c)(1)(C); see also id. § 951. The Act goes further as it provides that "a controlled foreign corporation shall, under regulations prescribed by the Secretary [of the Treasury], be considered as holding an obligation of a United States person if such controlled foreign corporation is a pledgor or guarantor of such obligations." Id. § 956(d).

Taking up the baton from Congress, in 1964 the IRS promulgated the two regulations at issue in this case. First, the agency determined when a CFC's pledge or guarantee would result in the CFC being deemed the holder of the loan:

> [A]ny obligation of a United States person with respect to which a controlled foreign corporation . . . is a pledgor or guarantor will be considered to be held by the controlled foreign corporation . . . .

26 C.F.R. § 1.956-2(c)(1). Second, the IRS determined how much of the "obligation" a CFC pledgor or guarantor would be deemed to hold:

> [T]he amount of an obligation treated as held . . . as a result of a pledge or guarantee described in § 1.956-2(c) is the unpaid principal amount of the obligation . . . .

6

Id. § 1.956-1(e)(2). As the Tax Court summarized, "a CFC whose assets serve (even though indirectly) as security for the performance of an obligation of a United States person will be considered a pledgor or guarantor of that obligation." SIH Partners, 2018 WL 487089, at *5.

Apparently the regulations were unchallenged for an extended period. But almost 50 years after their adoption, these statutes and regulations have come to bite Appellant, one of a cluster of companies affiliated with Susquehanna International Holdings ("SIH"). Through the SIH family, Appellant owns two CFCs. Another SIH affiliate, investment firm SIG, borrowed $1.5 billion from Merrill Lynch in 2007 in a loan guaranteed by over thirty SIH affiliates, including the two CFCs that Appellant owns. Even though the loan dwarfed the CFCs' assets that were roughly $240 million, Merrill Lynch insisted on having the CFCs guarantee the loan in order to "ring fence" the transaction—that is, for protection in case the deeper-pocketed domestic guarantors tried to dump their assets overseas with the CFCs.

In 2011, when the CFCs distributed earnings to Appellant, their domestic shareholder, the IRS stepped in. Applying the above regulations, the agency determined that Appellant should have reported its income from the CFCs at the time the CFCs guaranteed the loan to SIG. Per the regulations, the IRS treated each CFC as if it had made the entire loan directly, though the amount included in Appellant's income was reduced from the $1.5 billion principal of the loan to the CFCs' combined "applicable earnings." See 26 U.S.C. § 956(a)(2) (capping the taxable income to domestic shareholders at "the

7

applicable earnings of such controlled foreign corporation"). This addition to income even in the reduced amount was no small thing, as it resulted in an additional tax of $378,312,576 to Appellant.

Having applied its regulations to increase Appellant's taxable income and accelerate the tax date from 2011 to 2007, the IRS took the final step of raising Appellant's tax rate. Although the 2011 distribution of CFC earnings to Appellant would have been taxed at the 15% rate for "qualified dividend income" under 26 U.S.C. § 1(h)(11)(B)(i), the IRS found that its accelerated income inclusion through §§ 956(c)(1)(C) and 956(d) was not a dividend and therefore was taxable at the then applicable 35% rate for ordinary income. In the Tax Court, Appellant challenged both the validity of the § 956(d) regulations and the use of the ordinary income tax rate. These proceedings followed and resulted in the Tax Court granting summary judgment to the IRS, so Appellant lost on both issues.

## II. DISCUSSION

### A. Validity of the Regulations

Before we begin our analysis, we note that Appellant does not challenge the Commissioner's calculations with regard to the amount of its taxable income. Instead, it argues that the implementing regulations are invalid because they are arbitrary and capricious and violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and thus the addition to its income was unauthorized. Inasmuch as Appellant does not challenge the Commissioner's calculation of the amount

included in its income, we need not explain how the Commissioner made his calculations.

While we appreciate and agree with the Tax Court's masterful analysis rejecting Appellant's argument challenging the validity of the regulations, we need not explicitly rely on that analysis because Appellant's argument fails for a reason on which the Tax Court did not rely, inasmuch as Appellant asks us to review the regulations taking into account hindsight derived from matters occurring after their adoption. The Tax Court did not address the hindsight issue, but Appellant almost invited us to do so, for in its brief it argues that the IRS <u>practice</u> shows that the regulations are unreasonable. Appellant's br. 32. The IRS's practice, of course, followed the adoption of the regulations. Though the Commissioner has not raised this hindsight point on this appeal as a ground to affirm, we nevertheless consider it because a "court of appeals may affirm Tax Court decisions on any grounds found in the record regardless of Tax Court's rationale[.]" <u>ACM P'ship v. Comm'r of Internal Revenue</u>, 157 F.3d 231, 249 n.33 (3d Cir. 1998) (citation omitted). Thus, "[w]e may affirm a [decision of a lower] court for any reason supported by the record," <u>Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.</u>, 796 F.3d 293, 300-01 (3d Cir. 2015), even though no party has advanced the reason to affirm. <u>See</u> <u>Kline v. Zimmer Holdings, Inc.</u>, 662 F. App'x 121, 124 n.2 (3d Cir. 2016).

The rule supporting our approach with respect to hindsight evidence is clear, for we have stated that when reviewing an agency action under the APA, 5 U.S.C. § 706(2)(A), we must confine our review to "the full administrative record that was before the [agency] at the time" it took the action under review. <u>C.K. v. N.J. Dep't of Health and</u>

<u>Human Servs.</u>, 92 F.3d 171, 182 (3d Cir. 1996) (quoting <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 420, 91 S.Ct. 814, 825 (1971)); <u>see</u> <u>Tinicum Twp. v. U.S. Dep't of Transp.</u>, 685 F.3d 288, 294 (3d Cir. 2012). Specifically, Appellant argues that the regulations are arbitrary and capricious, because they do not take into consideration the possibility that if the IRS considers individually multiple CFCs that guaranteed the entire loan, the CFC shareholder may incur income larger than the loan, indeed potentially an amount multiple times the loan. Appellant further argues that even though certain loans triggering the taxable event could not have been made without the security provided by a CFC's guarantee, such is not always the case, so only those guarantees that are necessary for a shareholder to obtain a loan should be regarded as a repatriation and accordingly be treated as income to the domestic shareholder.

In support of the two above contentions, Appellant cites to the IRS's internal guidance, stating that the inclusion of income under § 956(c)(1)(C) of the Act should be determined on the facts and circumstances of each case to ascertain if there has been a repatriation of earnings. Appellant's br. 33-34. But Appellant's argument runs into the insurmountable obstacle that every guidance and ruling it cites in its brief occurred decades after the promulgation of the regulations under the Act in 1964.

In the circumstances, though the authorities might demonstrate the IRS's post-adoption recognition that the regulations do not always address economic reality, they are not evidence that the regulations were arbitrary or capricious <u>at the time they were promulgated</u>. We cannot and will not find half-century old regulations arbitrary and capricious, based on insights gained in the decades after their promulgation, when the

10

challenger, here Appellant, has not made a showing that those insights were known or, perhaps, at least should have been known to the agency at the time of the regulations' promulgation. See San Luis & Delta-Mendota Water Auth. v. Locke, 776 F.3d 971, 993 (9th Cir. 2014) ("Reviewing courts may admit evidence . . . only to help the court understand whether the agency complied with the APA's requirement that the agency's decision be neither arbitrary nor capricious. . . . But reviewing courts may not look to this evidence as a basis for questioning the agency's . . . analyses or conclusions."); Fearin v. Fox Creek Valley Conservancy Dist., 793 F.2d 1291 (6th Cir. 1986) ("While such subsequent factors may have some relevance, we may not simply substitute our judgment, improved by the luxury of hindsight, for that of the [agency], and hence cannot consider them as controlling.").[3]

---

[3] Appellant's APA claim may be generously construed as asserting a claim under 5 U.S.C. § 706(1), to "compel agency action unlawfully withheld or unreasonably delayed[.]" After all, we regard Appellant's argument as not so much that the initial regulations were arbitrary and capricious, but that the IRS failed to amend or promulgate new regulations to conform to later observed economic realities. Appellant, however, has not shown that it requested the IRS to amend its regulations. See Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378, 1389-90 (2015) (Breyer, J., concurring in part and concurring in the judgment) ("[W]hy could respondents not ask the federal agency to interpret its rules to respondents' satisfaction, to modify those rules, to promulgate new rules or to enforce old ones?"); Pub. Citizen Health Research Grp. v. Comm'r, FDA, 740 F.2d 21, 29 (D.C. Cir. 1984) (finding that plaintiff must exhaust administrative remedies before asserting a claim that an

When we raised the hindsight problem with Appellant at oral argument, Appellant argued that even at the time they were promulgated the regulations were arbitrary and capricious because the IRS failed to exercise its expertise to recognize the issues Appellant raises here. But the Supreme Court never has held that agency regulations must be the best or the most perfect solution possible to the problem at hand given the record before it. Rather, as that Court has explained:

> The scope of review under the 'arbitrary and capricious' standard is narrow. A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives. Rather, the court must uphold a rule if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.

FERC v. Elec. Power Supply Ass'n, 136 S.Ct. 760, 782 (2016) (citations and internal quotations omitted).

We see nothing arbitrary and capricious in the regulations which make an obvious and straight-forward determination that

---

agency failed to act); see also In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig., 751 F.3d 629, 634 (D.C. Cir. 2014) ("Absent a statutory duty to promulgate a new rule, a court cannot order it."). We hasten to add, however, that we do not suggest that if Appellant formally had made such a request and it was rejected, our result would have been different. We do not address this point because there was no such request.

the amount to be included in the domestic shareholder's income should equal the amount of the loan the CFC guaranteed up to the amount of the CFC's earnings. After all, no reasonable argument could be made otherwise with respect to the income to be included in the shareholder's income if the CFC makes a direct loan to its domestic shareholders. Consequently, it makes logical sense to hold that loan guarantees should be treated the same as a direct loan, a position supported by a straight-forward reading of the Act. See 26 U.S.C. § 956(d).

Appellant argues that, by enacting § 956(d) separately, Congress intended the Commissioner to promulgate more substantive regulations in its treatment of § 956(c)(1)(C) income, but Appellant does not explain what substantive mandates § 956(d) specifically imposed, and it certainly does not explain how the enactment of § 956(d) relates to the two issues it raises here that we describe above. There is no showing that Congress even recognized these issues. Absent evidence that the agency failed to follow a clear statutory mandate, we cannot find that the regulations were arbitrary and capricious. "If a statute is ambiguous, and if the implementing agency's construction is reasonable, [Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778 (1984)] requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980, 125 S.Ct. 2688, 2699 (2005) (citing Chevron, 467 U.S. at 843-44 & n.11, 104 S.Ct. at 2782 & n.11). "Where Congress has not merely failed to address a precise question, but has given an 'express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' then the agency's

'legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" Zheng v. Gonzales, 422 F.3d 98, 112 (3d Cir. 2005) (quoting Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2782). Nothing in the record here shows that the agency's interpretation of the scope of the statutes was unreasonable, or that the regulations in question failed to implement an articulable statutory mandate. Though there were other things the agency could have addressed in the regulations, we only review what it did.[4]

Moreover, as the Tax Court noted in its opinion, when the agency solicited public comments about the regulations when it was considering their adoption, it did not receive any comment about the possibility of multiple-counting of loan guarantors being an issue with the regulations. SIH Partners, 2018 WL 487089, at *7. Furthermore, the Commissioner noted at oral argument that he was unaware of a single instance where the inclusion of income under § 956(c)(1)(C) has resulted in the domestic shareholder receiving income greater than the loan amount. Appellant does not claim that it did in this case. It very

---

[4] Appellant also argues that the regulations were arbitrary and capricious because the agency failed to promulgate regulations to ensure that only those obligations that amount to a repatriation in substance should be included as income, because Congress only intended to capture as income those transactions that are "substantially the equivalent of a dividend." Appellant's br. 27. However, the plain language of the statutes in question does not impose this requirement on the agency. We do not read absent words into a statute "so that what was omitted, presumably by inadvertence, may be included within its scope." Lamie v. U.S. Trustee, 540 U.S. 526, 538, 124 S.Ct. 1023, 1032 (2004).

well could be that the practice of loan guarantees by multiple CFCs was exceedingly rare or simply did not occur back in 1964 and thus escaped agency consideration when it adopted the regulations, or that the hypothetical multiple-counting problem was not serious enough to require further examination. Appellant does not provide evidence suggesting another explanation.

Additionally, in 2015, the IRS did consider amending the regulations to include a cap on the inclusion of all income under § 956(c)(1)(C) to that of the loan amount guaranteed, see 80 Fed. Reg. 53,058, 53,062 (2015) (noting that "there could be multiple section 951 inclusions with respect to the same obligation that exceed, in the aggregate, the unpaid principal amount of the obligation" and requesting comments "on whether the Treasury Department and the IRS should adopt" a rule limiting this result), but decided against it. See Crestek, Inc. v. Comm'r of Internal Revenue, 149 T.C. 112, 129 n.8 (2017) (explaining the IRS's decision not to issue final rules). Even 50 years after the adoption of the regulations at a time that the IRS had the benefit of hindsight with respect to the regulations' application in practice, it chose to maintain the status quo. Evidently, the Commissioner did not consider the multiple counting issue a serious enough problem to warrant amendment of the regulations to deal with it.

In any event, we are satisfied that the regulations are not arbitrary or capricious merely because they may not adhere to the policies embodied in the statutes in every case. As the Supreme Court has recognized, "there are numerous federal statutes that could be said to embody countless policies. If agency action may be disturbed whenever a reviewing court is able to point to an arguably relevant statutory policy that was not

15

explicitly considered, then a very large number of agency decisions might be open to judicial invalidation." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 646, 110 S.Ct. 2668, 2676 (1990). To sum up this portion of our opinion, we see no compelling or even plausible reason to intervene under the APA to invalidate the regulations.[5]

Appellant further argues that even if we uphold the regulations, we should remand the matter to the IRS and require it to employ a facts-and-circumstances determination with respect to their application in this case, as Appellant asserts that IRS internal guidances, in particular Revenue Ruling 89-73, required it to make such an analysis. See Appellant's br. 33. Appellant contends that because the CFC guarantees were not

---

[5] To the extent Appellant argues that the agency did not provide an adequate explanation for its implementation of the regulations, we note that the regulations track the text of § 956(d) nearly verbatim. The almost word-for-word match keeps the IRS's terse explanation in line with the general principle that the more a regulation departs from a statute, the more an agency must explain itself. Cf. Good Fortune Shipping SA v. Comm'r of IRS, 897 F.3d 256, 262 (D.C. Cir. 2018) (faulting the IRS for providing "only a single, undeveloped statement" of explanation for a rule that "appear[ed] to rewrite" statutory rules surrounding stock ownership); Dominion Res., Inc. v. United States, 681 F.3d 1313, 1317–19 (Fed. Cir. 2012) (faulting the IRS for offering only "the general statement that the regulations are intended to implement" the statute, even as one regulation "directly contradict[ed]" the statute). Because the challenged regulations barely rocked the statutory boat, and because of the lack of public commentary and the straight-forward nature of the regulations, little explanation was needed.

essential to its domestic parent entity's ability to obtain the loans, the guarantees should not have been deemed as investments in United States properties under § 956(c)(1)(C), and thus should not have been included in its income. It further argues that Merrill Lynch insisted on the CFC guarantees to ensure that the domestic entity could not simply transfer assets to the CFCs in the event of its insolvency or default. The Tax Court in considering this point held that:

> Neither section 956(d) nor the regulations inquire into the relative importance that a creditor attaches to a guaranty. A guarantor's precise financial condition or the likelihood that it would be able to make good on its guaranty are irrelevant in determining under the regulations whether the guaranty gives rise to an investment in United States property. The regulations applicable in this case provide categorically that any obligation of a United States person with respect to which the CFC is a guarantor shall be considered United States property held by the CFC in the amount equal to the unpaid principal. They make no provision for reducing the section 956 inclusion by reference to the guarantor's financial strength or its relative creditworthiness.

SIH Partners, 2018 WL 487089, at *15 (citations omitted).

Surely the Tax Court was correct. Neither the Act nor the regulations nor any other statute states that the purpose of a CFC loan guarantee should be a factor in the determination of what constitutes § 956(c)(1)(C) income. Although Appellant argues that the IRS should have employed its own facts-and-

17

circumstances guidance and determined that the guarantees were not in substance repatriations, internal guidance directions are not binding on an agency and do not have the force of law. See Schweiker v. Hansen, 450 U.S. 785, 789, 101 S.Ct. 1468, 1471 (1981). "A revenue ruling is simply the opinion of the Service's legal counsel which has not received the approval of the Secretary nor of Congress. A ruling is not a regulation and does not bind the IRS." Temple Univ. v. United States, 769 F.2d 126, 137 (3d Cir. 1985). "[A]lthough revenue rulings may be helpful, they do not have the force of law." Geib v. N.Y. State Teamsters Conference Pension & Ret. Fund, 758 F.2d 973, 976 (3d Cir. 1985). Moreover, Appellant's contention that the guarantees were not "necessary" is a matter of opinion rather than a recitation of historical fact.

We point out that, although the observation is not controlling, we cannot dismiss at least the possibility, if not the likelihood, that Merrill Lynch would not have made the loans without the CFC guarantees. There is no way to know for sure if it would have taken that position because Appellant was in control of the CFCs and the circumstances at the time of the loans cannot be recreated. Though we realize that Merrill Lynch could have made the loans on the basis of the parent entity's creditworthiness, we see no reason to doubt that it made its decision based on its assessment of the parent entity's ability to repay the loans and the guarantees on which it insisted. After all, Merrill Lynch surely recognized that it could have sought to recover the loans from the CFCs, if necessary to do so if the parent entity did not repay them. In sum, we are satisfied that the guarantees were properly included in Appellant's income.

B.    The Tax Rate

18

Appellant's final argument is that even if income was validly attributed to it by the regulations, the tax rate on the income should be the favorable rate applicable to dividends in the years in question, rather than the higher rate applicable to ordinary income, because the statutes deem the repatriation "as if it were a dividend." Dougherty, 60 T.C. at 926; see SIH Partners, 2018 WL 487089, at *18. The Tax Court rejected this argument, as it held "[t]he fact that [the Act] in operation treat[s] a CFC's investment in United States property 'as if it were a dividend' in no way establishes that the income inclusions required for shareholders thereunder actually are dividends for general purposes of the Code." Id. The Court, of course, was correct—analogizing one concept to another does not make them completely interchangeable.

We start our analysis of the tax rate issue by pointing out that the obligation of a United States person is just one type of property the Act defines as an investment in United States properties for income inclusion purposes. Other types of property include tangible property, stock in a domestic corporation, intellectual property rights, inventions, designs, and trade secrets. 26 U.S.C. § 956(c)(1). Accordingly, a CFC's domestic shareholders incur taxable income when the CFC makes an investment in United States properties—that is, if it simply purchased domestic land, stock, or intellectual property rights for whatever purpose regardless of whether it distributed any such purchases to any shareholder. Under Appellant's proposed construction, all such income would become "dividends," which we understood it conceded at oral argument to be the consequence of its proposed construction.[6] To

---

[6] Even if we misunderstood the scope of the concession, the construction under Appellant's construction would have had that

19

Appellant, they are "constructive dividends."

But as we have held, "unless a distribution which is sought to be taxed to a stockholder as a dividend is made to him or for his benefit it may not be regarded as either a dividend or the legal equivalent of a dividend." Holsey v. Comm'r of Internal Revenue, 258 F.2d 865, 868 (3d Cir. 1958) (emphasis added). Indeed, the Internal Revenue Code defines dividends as "any distribution of property made by a corporation to its shareholders[.]" 26 U.S.C. § 316(a) (emphasis added). Appellant asks us to construe the Act in such a way as to find that all income inclusions under § 956 to be "constructive dividends," regardless of whether any distribution has been made by the CFC, or whether any such investments are for the benefit of the domestic shareholders. We can find no case law holding that a taxpayer has received dividend income when neither of those two criteria has been satisfied. See Rodriguez v. Comm'r of Internal Revenue, 722 F.3d 306, 309 (5th Cir. 2013) (finding that § 956 "inclusions do not constitute actual dividends because actual dividends require a distribution by a corporation and receipt by the shareholder"). As such, Appellant's overbroad construction of § 956 would result in income being classified as a "constructive dividend" even when that income does not come within any plausible definition of a "dividend." We reject such implausible construction of § 956 income.[7]

---

consequence.

[7] Appellant argues the agency erred in ruling that § 956(c)(1)(C) income is not a dividend because the agency has enacted regulations in the past treating certain other § 956 income as

We recognize the crux of Appellant's real argument to be that loan guarantees under § 956(c)(1)(C) are special cases, as guarantees ordinarily are given for the benefit of shareholders, and thus loan proceeds are akin to distributions and should be taxed as dividends if they are taxed at all. However, § 956(c)(1)(C) mandates the inclusion of a loan guarantee as income when the CFC holds "an obligation of a United States person[.]" That person does not have to be a shareholder. In fact, a CFC may guarantee a loan to a charitable organization for charitable purposes, and if it does so the CFC's domestic shareholders will receive taxable income. To hold in that scenario that the domestic shareholders' income should be regarded as a dividend would defy common sense.

Furthermore, Congress knows how to deem § 951(a) income as dividend income for specific purposes. See, e.g., 26 U.S.C. §§ 904(d)(3)(G) & 960(a)(1) (2017). Thus "Congress specifically designates when § 951 inclusions are to be treated as dividends," but "Congress has not so stated" for purposes of the tax rate for qualified dividend income under 26 U.S.C. § 1(h)(11)(B)(i). Rodriguez, 722 F.3d at 311. As the Tax Court noted, if Congress desired to tax § 956(c)(1)(C) income as dividends, it could have done so in the fifty-plus years since the Act's original passage, and it did not. SIH Partners, 2018 WL 487089, at *18. "[I]t is clear that Congress did not intend to deem as dividends the [] inclusions at issue here. The statute is completely silent [on the point,] a fact which carries added weight when compared to the myriad provisions specifically

dividends. We are unsure why treating certain § 956 income as dividends requires the agency to treat other § 956 income as dividends. Regardless, as we stated above, absent statutory mandate, we are powerless to compel agency action.

21

stating that certain income is to be treated as if it were a dividend." Rodriguez, 722 F.3d at 312.

Significantly, Appellant's own actions undermined its argument: in 2010 and 2011, the CFCs made distributions of dividends to their shareholders, and by doing so triggered the IRS audit leading to the income inclusion and thus to this litigation. Appellant's br. 16. If Appellant wanted the CFCs' income to be treated as dividends, it was well aware of the best way to do so—paying out actual dividends to shareholders. The circumstance that its tax planning did not lead to a result favorable to it does not provide us with a reason to adopt a questionable construction of a well-established statute and the regulations under it. As another court has stated:

> Appellants could have caused a dividend to issue. They could have also paid themselves a salary or invested . . . earnings elsewhere. Each of these decisions would have carried different tax implications, thereby altering our analysis. Appellants cannot now avoid their tax obligation simply because they regret the specific decision they made.

Rodriguez, 722 F.3d at 310.

## III. CONCLUSION

For the foregoing reasons, we will affirm the Tax Court's January 18, 2018 decision and order in its entirety.